**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| TRISTAN W. GILLESPIE, | * | Case No. 21-mc-14 |
| | * | (DISCIPLINARY) |
| Respondent. | * | |
| | * | |
| | *** | |

## REPORT AND RECOMMENDATION

Pending before this three-judge Panel of this Court's Disciplinary and Admissions Committee (the "Panel")[1] is attorney Tristan W. Gillespie's alleged breach of the applicable Rules of Professional Conduct[2] in more than 600 cases filed on behalf of two clients with disabilities. In these cases, Gillespie has sued defendant hotels for failing to provide sufficient information through on-line reservation systems regarding room and hotel accommodations for patrons with disabilities, in violation of Title III of the Americans with Disabilities Act ("ADA"). Gillespie's conduct before this Court and others has prompted this investigation into whether Gillespie has violated the Rules of Professional Conduct concerning candor to the tribunal, the duty to keep his clients reasonably informed, and candor during settlement negotiations. After a full investigation and an evidentiary hearing, the Panel recommends that Gillespie be suspended for six months from the Bar of this Court, with the right thereafter to petition for reinstatement.

To place this disciplinary matter in proper context, we first summarize the nature of the ADA cases that Gillespie has pursued in this Court and elsewhere. Next, we review the investigative history of this disciplinary matter. Third, we summarize the additional evidence

---

[1] The Panel is comprised of the Hon. Paula Xinis (Chair), the Hon. Deborah L. Boardman, and the Hon. Ajmel A. Quereshi.

[2] Members of this Bar are expected to follow the Maryland Attorneys' Rules of Professional Conduct ("MARPC").

gathered during the evidentiary hearing in which Gillespie testified at length.  Fourth, we review the professional conduct rules that Gillespie, in our view, has clearly violated.  Last, we set forth our rationale for the recommended discipline.

### I.     ADA Tester Cases

Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation[.]"  42 U.S.C. § 12182(a).  Implementing regulations require that a hotel "[i]dentify and describe accessible features in the hotels and guest rooms offered through its reservations system in enough detail to reasonably permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs[.]"  28 C.F.R. § 36.302(e)(1)(ii).  When a hotel provides inadequate information, private individuals may file suit to secure compliance under the ADA.  42 U.S.C. § 12188(a).  Of particular relevance here, a plaintiff cannot recover money damages for a statutory violation; only reasonable attorneys' fees and litigation costs are available.  42 U.S.C. § 12205.  Although some states permit money damages by statute on a finding of a Title III violation, Maryland is not one of them.

A handful of plaintiffs, styling themselves as "testers," have relied on Title III to bring a spate of lawsuits.  The tester plaintiffs investigate violations of the requirement to identify and describe accessibility features by reviewing the on-line reservation information for small hotels throughout the country.  Gillespie, in conjunction with Thomas B. Bacon and Thomas Bacon, P.A. ("the Firm"), has filed over 600 tester lawsuits, principally on behalf of plaintiffs Deborah Laufer and Saim Sarwar.  *See Laufer v. Arpan LLC*, No. 20-14846, 2023 WL 2910529, at *2 (11th Cir. Apr. 12, 2023) (Newsom, J., concurring in denying reh'g en banc) ("Laufer and two

other plaintiffs—all conspicuously represented by the same lawyers—have filed more than 1000 website-related ADA suits against hotels during the last few years.").  Each action begins with a near identical complaint and follows the same process.  ECF No. 6 at 16.  Of the more than 600 cases filed, many have settled under terms that include the hotel paying Gillespie's fees and costs.  If the hotel does not defend the matter, Gillespie seeks default judgment, which includes petitioning courts to award attorneys' fees and costs.  No tester case, to this Panel's knowledge, has ever gone to trial.

> ## II.    Investigative History

> ### A.  Referral of Gillespie for Disciplinary Inquiry

Gillespie became a member of our Bar on May 1, 2020, apparently for the sole purpose of pursing ADA tester cases.  He filed 23 such suits in short succession.  Once the Court recognized that the cases were copies of one another, different only in the parties and dates of website review, the cases were reassigned to the Honorable Stephanie A. Gallagher.  Two such matters resulted in substantial litigation before Judge Gallagher.  *See Laufer v. Naranda Hotels, LLC*, No. SAG-20-2136 (D. Md. filed Aug. 17, 2020); *see also Laufer v. Ft. Meade Hospitality, LLC*, No. SAG-20-1974 (D. Md. filed July 3, 2020).

In *Naranda Hotels*, the defendant hotel urged dismissal of the case on jurisdictional grounds, contending that Plaintiff Laufer lacked standing to pursue the claim because she failed to allege any plausible injury-in-fact.  Motion to Dismiss, *Laufer v. Naranda Hotels, LLC,* No. SAG-20-2136 (D. Md. Sept. 29, 2020), ECF No. 13.  The Court granted Laufer an evidentiary hearing to establish injury-in-fact by demonstrating that she intended to travel to the defendant hotel.  At the hearing, Gillespie called Laufer as a witness to establish her intent to travel.

In connection with the motion, Judge Gallagher reviewed scores of other out-of-district

cases Gillespie had filed on Laufer's behalf, principally to ascertain whether Laufer had made

similar representations under oath of a present intent to travel to the areas of the other defendant

hotels.  Judge Gallagher took note that, in those cases, Laufer, through Gillespie, had filed

affidavits in which she swore that "as soon" as the Covid pandemic subsided, she intended to

travel throughout the states in which she has filed her tester lawsuits, "including places as far

afield as Colorado, Illinois, Texas, and Wisconsin." *Laufer v. Naranda Hotels, LLC*, No. 20-

2136, 2020 WL 7384726, at *8 (D. Md. Dec. 16, 2020).  Ultimately, Judge Gallagher found that:

> In total, Plaintiff has filed at least 557 suits in sixteen different states, plus the
> District of Columbia.  When her standing to sue has been challenged, she has used
> virtually identical language in each case to describe her travel plans, changing
> only the locations she plans to visit to correspond with the location of the
> defendant hotel.  Inherent in Plaintiff's use of cookie-cutter sworn statements
> across the country is a core underlying inconsistency:  it is impossible for her to
> actually travel to all of these places "as soon as" the pandemic ends.  Even if one
> takes a charitable view of the fluid itineraries in her filings and testimony and
> assumes that she will travel to a number of northeastern states as well as
> Maryland, such a tour cannot in good faith be deemed to include states like
> Colorado, Texas, Wisconsin, and Illinois.  The existence of the plethora of
> contradictory representations renders her testimony about her planned Maryland
> trip highly dubious. . . . This Court reaches the inescapable conclusion that
> Plaintiff's purported future plans to visit Maryland cannot be credited, and thus—
> even if such plans had been otherwise sufficient to support her standing to sue as
> of the summer of 2020—no standing exists here.

*Id.* at *8-9.

From this, Judge Gallagher concluded that Laufer's "inability to obtain information" on

accommodation availability alone is insufficient to satisfy the injury-in-fact prong of standing.

*Id.* at *4.[3]  Judge Gallagher's survey of the Laufer cases also exposed Gillespie's questionable

---

[3] Laufer appealed Judge Gallagher's ruling, arguing in part that the District Court erred in concluding as a
matter of law that Laufer lacked standing based solely on the alleged informational injury.  Notice of Appeal, *Laufer
v. Naranda Hotels, LLC*, No. SAG-20-2136 (D. Md. Dec. 16, 2020), ECF No. 28.  The Fourth Circuit vacated this
Court's decision, concluding that Laufer's alleged injury was sufficient to establish standing.  *See generally Laufer
v. Naranda Hotels, LLC*, 60 F.4th 156 (4th Cir. 2023).  In doing so, the Fourth Circuit created an even 3-3 circuit
split as to whether Laufer's "informational or stigmatic injury" confers Article III standing.  *Id.* at 174.  The
Supreme Court has granted certiorari to resolve this circuit split.  *Acheson Hotels, LLC v. Laufer*, No. 22-429, 2023
WL 2634524 (Mem), at *1 (U.S. Mar. 27, 2023).  Gillespie is not involved in the Supreme Court matter, and

practices as Laufer's attorney.  As Judge Gallagher explained in her referral to this Court's

Disciplinary and Admissions Committee (the "Committee" or "D & A Committee"), Laufer

alone had filed more than 600 cases across the country and Sarwar near 200, all through the

Firm, and hundreds with Gillespie as counsel of record.  The cases uniformly were brought

against small hotels and follow the same pattern—at the time of suit, the defendant received a

demand for corrective action and payment of $10,000 in attorneys' fees to settle the case.  Given

that the complaints across all cases are boilerplate with few changes apart from dates and

defendants, it appeared highly improbable that Gillespie actually could have accrued $10,000 in

reasonable attorneys' fees and costs when each demand was made.

Also noteworthy to Judge Gallagher was that many hotels never responded to the

complaints, which permitted Gillespie to seek default judgment and petition for attorneys' fees.

A cursory review of submitted fee petitions revealed that Gillespie likely inflated the hours spent

on any given matter.  Despite Gillespie's use of boilerplate complaints in every case—to include

the same typos and misspellings—he billed anywhere from two to four hours just to "draft" each

pleading.  Additionally, for some petitions, Gillespie had attached his resume, which reflected

that he worked contemporaneously as an Assistant District Attorney for Fulton County, Georgia.

In other petitions, however, Gillespie omitted this employment from his resume.  In those

petitions where the employment was omitted, Gillespie advocated for the requested fee because

he must "forego other business clients" to pursue "these less desirable" ADA tester cases.  ECF

No. 6-1 at 3.

Accordingly, Judge Gallagher referred Gillespie to the D & A Committee for further

inquiry as to whether Gillespie had:  (1) suborned perjury in sponsoring Laufer's testimony; (2)

---

Laufer's success on appeal has no bearing on the issues underlying this disciplinary matter.

failed to cite pertinent District of Maryland cases dismissing Laufer's lawsuits for lack of

standing; (3) filed lawsuits with the sole objective of extracting outsized attorneys' fees as part of

settlements with the hotels; and (4) misrepresented to federal courts in fee petitions the number

of hours actually worked, his current employment, and other matters relevant to the

determination as to whether the requested attorneys' fees were warranted.

After careful consideration of the referral, and based on Committee recommendation, the

full Bench appointed Attorney Evan Shea, Esq. from Venable LLP (the "Investigator") to

investigate the allegations.  The investigation lasted several months and was exhaustive.  The

discussion below summarizes the investigation and its findings.

### B.  Attorney Investigator Inquiry

The Investigator first collected and reviewed publicly docketed documents across the

nation in the ADA cases for which Gillespie was attorney of record.  Next, the Investigator

requested that Gillespie produce (1) all ADA tester complaints and settlement communications

for cases filed in this District; (2) documents or communications memorializing client fee

agreements; (3) documents or communications related to payments to or from clients in ADA

testers cases; (4) documents or communications regarding his efforts to verify his clients' factual

averments; (5) documents related to Laufer's claimed intent to travel as articulated before Judge

Gallagher; (6) communications reflecting how Gillespie calculated attorneys' fees owed for each

ADA matter; and (7) all attorney fee petitions previously filed.  ECF No. 6 at 3.  The Investigator

also interviewed Gillespie on July 22, 2021, Bacon on August 17, 2021, and Siam Sarwar and

Deborah Laufer on December 10 and 20, 2021, respectively.  *Id.*  On February 1, 2022, the

Investigator submitted his Report and Recommendation (the "Report") to the Committee.

### C.  Initial Investigator Report

According to the Report, Gillespie has practiced law since graduating from Rutgers

University Law School in 2006.  He became a member of the Maryland State Bar in 2015 and of

this Bar in May of 2020.  In 2018, Gillespie became an Assistant District Attorney in Georgia

and, in 2019, he started also working part-time for Thomas B. Bacon at the Firm, representing

ADA tester plaintiffs.  ECF No. 6 at 7-8.  Both employers were aware of the arrangement and

approved of it.  Gillespie has never met Bacon in person, although Bacon oversees all of

Gillespie's work and settlement negotiations through phone calls and email.  *Id.* at 8.

For every ADA tester case, Gillespie employs a near identical litigation process.  First,

the plaintiff searches the web to identify potentially ADA-noncompliant hotels.  The plaintiff

next forwards that information to the Firm's "investigator," Daniel Pezza.  Pezza essentially

duplicates the plaintiff's internet research, except he—purportedly charging an hourly rate—bills

exactly $650[4] per case for time spent preparing an ADA "expert" report.  The "expert" report

includes screenshots of hotel websites, which document the purported violations.  Pezza attests

in every report that he has "reviewed each and every page and picture provided."  ECF No. 6-11

at 4.  Although Pezza is always characterized as an ADA "expert" in court filings, he has no

apparent bona fides, and instead seems to simply review or rehash the plaintiffs' on-line efforts.

*Cf. Kennedy v. Sun Coast Motels, Inc.,* No. 8:18-cv-1688-T-30CPT, 2018 WL 6724759, at *2

(M.D. Fla. Dec. 21, 2018) ("there is no explanation as to how Pezza's total fee of $600.00 is

reasonable"); *Kennedy v. KSK Invs. LLC*, No. 6:17-cv-640-Orl-37KRS, 2017 WL 6403072, at *4

(M.D. Fla. Nov. 24, 2017), *report and recommendation adopted*, 2017 WL 6387974 (M.D. Fla.

Dec. 14, 2017) (rejecting fee request for "claimed expert witness" Pezza); *Parks v. Bre/Sanibel*

---

[4] Earlier in the tester litigation, Pezza had billed exactly $600 per report for his "hourly" services but has since increased the charged fee by $50.

*Inn Owner L.L.C.*, No. 2:20-cv-188-FtM-38NPM, 2021 WL 71602, at *7 (M.D. Fla. Jan. 8, 2021) (reducing Pezza expense because in three related cases, plaintiff submitted "a boilerplate copy and paste" report); *Kennedy v. Bonom Enterprises, Inc.*, No. 18-cv-62175, 2019 WL 1429513, at *4 (S.D. Fla. Mar. 29, 2019) (denying Pezza expense as unsupported).  Pezza forwards his report to Gillespie, who plugs the hotel information into a template complaint, allowing him to generate pleadings at a rapid pace.  In one day, Gillespie has filed as many as sixteen ADA tester complaints.  ECF No. 6 at 15.[5]

Once the complaint is filed, Gillespie immediately pushes to settle the matter.  According to the Report, Bacon and Gillespie rely on early settlements to "offset losses incurred" from those cases that "never yield compensation," and thereby keep the Firm solvent.  *Id.* at 17.  To maximize the chance of quick resolution, Gillespie (at Bacon's direction) offers the defendant hotel one of three options:

> A. Defendant agrees to cure the on-line informational defects within 24 months and pay a flat attorney fee of $10,000 for "past, present and anticipated future costs, expenses, and attorney time[.]"  In exchange, Plaintiff releases "all claims or potential claims" against the defendant.
> B. Defendant agrees to cure the on-line informational defects within 12 months and pay a flat attorney fee of $6,500 in exchange for a limited release of claims related to the "subject website."
> C. Parties enter into a consent decree where the defendant agrees to bring the website into compliance and let the Court determine appropriate attorneys' fees and costs.

---

[5] *See Laufer v. Krishna Real Estate 4 LLC*, No. 3:20-cv-00745 (W.D. Wis. Aug. 11, 2020); *Laufer v. Ambe Mata LLC*, No. 3:20-cv-00747 (W.D. Wis. Aug. 11, 2020); *Laufer v. Alamac, Inc.*, No. 1:20-cv-02206 (D.D.C. Aug. 11, 2020); *Laufer v. HH Churchill Hotel Associates, L.P.*, No. 1:20-cv-02207 (D.D.C. Aug. 11, 2020); *Laufer v. R B Properties Inc.*, No. 1:20-cv-02208 (D.D.C. Aug. 11, 2020); *Laufer v. Ind. Realty Co.*, No. 2:20-cv-10323 (D.N.J. Aug. 11, 2020); *Laufer v. Capri Little Ferry LLC*, No. 2:20-cv-10324 (D.N.J. Aug. 11, 2020); *Laufer v. 145 Dean Drive LLC*, No. 2:20-cv-10325 (D.N.J. Aug. 11, 2020); *Laufer v. Bhole Shankar, Inc.*, No. 1:20-cv-00114 (S.D. Ga. Aug. 11, 2020); *Laufer v. PSNVR LLC*, No. 3:20-cv-00052 (S.D. Ga. Aug. 11, 2020); *Laufer v. Hasmukh H. Patel*, No. 5:20-cv-00314 (M.D. Ga. Aug. 11, 2020); *Laufer v. Ohm Shiv Ganesh Inc.*, No. 5:20-cv-00102 (S.D. Ga. Aug. 11, 2020); *Laufer v. Tribhuvan Real Estate LP*, No. 2:20-cv-01188 (W.D. Pa. Aug. 11, 2020); *Laufer v. Richbell Carrollton, LLC*, No. 8:20-cv-02325 (D. Md. Aug. 11, 2020); *Laufer v. Vijay Inc.*, No. 2:20-cv-01193 (W.D. Pa. Aug. 11, 2020); *Laufer v. Jay Sai Ganesh LLC*, No. 1:20-cv-03317 (N.D. Ga. Aug. 11, 2020).  Gillespie filed certain complaints with the wrong defendant name, prompting a refile to correct the error.

*Id.* at 18 (paraphrased); *see also* ECF No. 6-8.  Most of the time, defendant hotels accept one of the three offers with minimal negotiation.

However, when the matter does not settle and the defendant does not participate in the lawsuit, Gillespie moves for default judgment.  In connection with the default motions, Gillespie files a boilerplate fee petition seeking attorneys' fees, expenses, and costs.  For these petitions, Gillespie routinely inflates the time expended to prosecute the cases.  Even though Gillespie has admitted that drafting any given complaint involves merely "plugging in" the defendant's name and similar information into a template, Gillespie routinely bills "at least 3.9 [hours] of attorney time" for drafting the complaint and related tasks.  ECF No. 6 at 19.

This regular exaggeration of time spent is most obvious when considering the sheer number of cases that Gillespie files on any given day.  For instance, on the day that Gillespie filed sixteen cases, Gillespie represented in three subsequent fee petitions that he spent 4.9 hours, 4.9 hours, and 3.9 hours drafting the complaints, for a total of 13.7 billable hours.  *Id.* at 15, 19-20.  That day was also a weekday when Gillespie was working full-time as an Assistant District Attorney.  *Id.* at 20.  When the Investigator confronted Gillespie about the impossibility of his claimed hours worked, Gillespie remained steadfast that his timekeeping was accurate.  *Id.* at 21.

As for settled cases, Gillespie furnished all settlement agreements and timekeeping records for cases he filed in Maryland.  Because the ADA does not allow money damages, the monetary aspect of the settlements was limited solely to attorneys' fees and costs.  But frequently, the agreed-upon settlement sum was larger, sometimes substantially so, than the actual attorneys' fees and expenses logged by the Firm.  In one circumstance, the actual time spent on the case added up to less than half of the settlement amount.  *Id.* at 22.  In response, Gillespie and Bacon admitted that their "settlement demands represented something more than

just time spent on a case and costs incurred," *id.* at 23, even though Title III prohibits such.  *Id.* at

11 (citing *Equal Rts. Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 728 n.12 (D. Md. 2011)).

### D.  Report Findings and Recommendations

As to certain areas of inquiry, the Report found no evidence of misconduct.[6]  However,

the Report described a disturbing pattern of Gillespie having exaggerated and misrepresented

work performed or to be performed to opposing counsel during settlement negotiations and to

various courts in his fee petition submissions.  We focus on those findings.

The Investigator concluded that Gillespie had likely violated Maryland Attorneys' Rule

of Professional Conduct 19-304.1, which prohibits counsel "in the course of representing a

client" from "making a false statement of material fact or law to a third person," including false

statements made during settlement negotiations.  *See id.* at 33 (citing *Ausherman v. Bank of Am.*

*Corp.*, 212 F. Supp. 2d 435, 445-452 (D. Md. 2002)).  In mitigation, the Investigator noted that

Gillespie always couched his fee requests to opposing counsel to include "future" fees.

Although Gillespie candidly admitted he had *never* engaged in the post-settlement due diligence

that would constitute a "future cost," the Investigator reasoned that the potential of future due

diligence "permit[ted] an 'out' from inflated settlement figures."  *Id.* at 34.  The Investigator also

found mitigating that Gillespie follows the lead of Bacon, who is largely responsible for

directing the settlement negotiations.

The Investigator also concluded that Gillespie had knowingly made false statements in

connection with fee petitions filed in federal courts.  The Investigator stressed that the requested

attorney hours are "implausibly high," and continued to be even after at least one court in 2018

---

[6] These included potential subornation of perjury as to Laufer's testimony before Judge Gallagher; the failure to bring contrary authority to Judge Gallagher's attention; whether Gillespie was filing frivolous tester cases; and whether plaintiffs received direct improper payments from the Firm.

found that similar requests by Gillespie's partner, Bacon, were unreasonable.  *Id.* at 34-35 (citing Order Granting Plaintiff's Mot. for Default J., *Kennedy v. SATYA GROUP, LLC*, No. 2:17-cv-14393-RLR (S.D. Fla. Jan. 3, 2018) (finding that it was not "reasonable to expend a combined 84 minutes drafting" essentially a boilerplate complaint)).  But at the same time, the Investigator noted that courts had routinely accepted that Gillespie's fee petitions reflect at least *some* time spent on the matters.  For these reasons, the Investigator recommended that the Committee issue Gillespie a warning to take greater care in his future representations to courts and opposing counsel.

### E.  D & A Committee Review

After careful review of the Report, the Committee was not prepared to adopt the recommended informal disposition without further inquiry into Gillespie's misrepresentations in settlement practices and fee petitions.  Accordingly, the Committee recommended to the full Bench that Gillespie be made to show cause as to why more formal discipline, up to and including disbarment, should not be considered.  Also, given the passage of time, the Committee recommended that the Court order Gillespie to produce all fee petitions filed since his interview with the Investigator on July 22, 2021.

The full Bench adopted the Committee's recommendation.  On March 10, 2022, Chief Judge James K. Bredar issued an Order notifying Gillespie that the Court had initiated formal disciplinary proceedings against him.  ECF No 7.  The Order also directed Gillespie to supplement the record with all fee petitions filed from July 22, 2021, "until the matter is concluded."  *Id.*  Last, the Order directed Gillespie to show cause why he should not receive formal discipline, including suspension or disbarment, based on the Report's findings.

On April 14, 2022, Gillespie responded to the Order.  ECF No. 9.  Gillespie stated that he

"deeply regrets" the "mistakes" made in his fee petitions, but denied any misrepresentation made in settlement negotiations as to the time and money spent prosecuting the cases. *Id.* at 2. Gillespie also argued that, had the Investigator accounted for "actual expenses" incurred in each case, "the settlement amounts would not have been excessive." *Id.* Gillespie emphasized that "anticipated future time" he could plausibly spend on a case justified the inflated settlement demand, even though he had never once, in the over 600 cases he handled, ever spent any time on a case after it settled. Gillespie also invoked "caselaw" that counseled against court involvement in settlement negotiations, and cited, without elaboration, a supposed "double-standard" in negotiations between plaintiffs and defendants. *Id.* at 6, 8.

Gillespie also provided his fee petitions filed after he had become aware of this investigation. The fee petitions for the post-investigation period reflected no real change in Gillespie's habitual overbilling.

The Committee also learned during this time that in *Sarwar v. Patel Invs., Inc.*, Case No. 5:21-cv-118 (D. Vt. filed Apr. 26, 2021), Gillespie allowed his client, Saim Sarwar, to testify falsely during an evidentiary hearing on whether Sarwar intended to travel to the defendant hotel. Sarwar, who suffers from cerebral palsy, described that he took a four-day excursion to the Vermont area where he was driven by "Daniel Pezza," whom Sarwar described as the guy who "helped [Sarwar] out." When asked specifically whether Pezza was "paid" for his assistance, Sarwar answered no. Gillespie never corrected his client's misrepresentations—that Pezza in fact was the Firm's paid investigator on all ADA matters—which resulted in the court finding that Sarwar made the trip with the able assistance of his "friend," Daniel Pezza. *Sarwar v. Patel Invs., Inc.*, No. 5:21-cv-118, 2022 WL 1422196, at *1, 4 (D. Vt. May 5, 2022).

Consequently, the Committee recommended to the full Bench the appointment of a three-

judge panel to conduct an evidentiary hearing on whether Gillespie has violated the applicable

rules of professional conduct and, if so, the appropriate disposition of the disciplinary matter.

Accordingly, on June 1, 2022, the Court ordered that on Gillespie appear before a three-judge

panel on September 23, 2022, for a formal disciplinary hearing.  ECF No. 10.

### F.  Supplemental Investigator Report

In advance of the hearing, the Investigator submitted to the Committee a Supplemental

Investigator Report ("Supplemental Report").  As to the *Patel* matter, the Supplemental Report

concluded that Gillespie likely violated Maryland Attorneys' Rule of Professional Conduct 19-

303.3(a)(4), which prohibits an attorney from knowingly sponsoring false testimony.  The

Supplemental Report explained that where a client has provided materially inaccurate testimony,

the attorney must direct the client to correct the record, and if the client cannot or will not, the

lawyer must "reveal the fraud to the tribunal.'"  ECF No. 11 at 3 (quoting *Holden v. Blevins*, 154

Md. App. 1, 5 (2003) (citing *Att'y Grievance Comm'n v. Sperling*, 296 Md. 558, 563 (1983)).

Gillespie took no action to correct the record.  When asked to explain his inaction, Gillespie

stated that Sarwar suffers from cerebral palsy, which caused him to not "process information

very well." *Id.*  The Investigator rejected this excuse, reasoning that "regardless of Mr. Sarwar's

medical condition, Mr. Gillespie had an ethical duty to disclose to the court that Mr. Pezza was

paid by Mr. Bacon and/or Thomas B. Bacon, P.A." *Id.* at 4.

The Supplemental Report also confirmed that Gillespie continued to file exaggerated fee

petitions in courts throughout the country.  ECF Nos. 11 at 4-5 & 11-2 at 2.  Gillespie persisted

in doing so even after the Investigator questioned him at length about his billing practices, and

after Gillespie apologized for the "mistakes" he previously made.  Accordingly, the Investigator

confirmed that, despite being under investigation, Gillespie had not changed his approach to

these matters at all.

Last, the Report noted that after Gillespie learned that the Court intended to hold an evidentiary hearing on his disciplinary matter, Gillespie decided to cease ADA tester litigation altogether and began dismissing his active tester actions in droves.  ECF No. 11 at 5.  As of August 2022, a month before the hearing, Gillespie had only a handful of open, active ADA tester cases.  ECF No. 11-2 at 2.

### III.   Evidentiary Hearing

On September 23, 2022, the Panel held the evidentiary hearing.  Both the Investigator and Gillespie delivered opening remarks.  Gillespie next agreed to answer Panel questions under oath.

The Panel first questioned Gillespie about his fee petitions.  Specifically, the Panel pressed Gillespie on the representations made to both courts and opposing counsel in connection with attorneys' fees.  Although Gillespie always negotiated a potential attorneys' fees settlement with "future fees" as part of the fee demand, Gillespie confirmed that he has *never* conducted additional work on any case after settlement to ensure the hotel is ADA compliant.  Hearing Transcript at 46, *In re Tristan W. Gillespie*, 1:21-mc-00014 (D. Md. Sept. 23, 2022) ("Tr.").

The Panel also reviewed with Gillespie the inflated hours he submitted in scores of fee petitions.  Gillespie admitted, under oath, that he falsely represented in several fee petitions that it took him more than two hours to draft the respective complaint.  *Id.* at 55 (Question: "To draft the complaints, do you stand by the number two and a half hours?"  Answer: "No.").  Gillespie also admitted that in several other fee petitions, he did not disclose that he was simultaneously employed as an Assistant District Attorney, nor did he have a "perfect answer" for why he omitted this information.  Gillespie also admitted that in the same petitions, he would argue for

his full fee because taking unpopular ADA cases "precludes" him from other employment. Gillespie acknowledged that this omission, combined with his proffered "inability" to secure other work, was both "inaccurate" and misleading.  *Id.* at 70-71.

The Panel next turned to Gillespie's habitual practices at three critical points in his representation of Laufer and Sarwar:  (1) the terms under which the Firm and Gillespie were hired to pursue the ADA tester cases; (2) the settlement process; and (3) the decision to dismiss an action before resolution.  The Panel also questioned Gillespie about the familial relationship between Laufer and Pezza.  Each topic merits detailed discussion.

### A.  Client Retainer Agreements

Although Gillespie had not drafted or participated in executing the retainer agreements with his clients, these agreements referred to Gillespie as the client's counsel, and Gillespie acknowledged that he was familiar with the agreements' terms and conditions.  He also recognized that he was obligated to ensure that his clients understood the agreements.[7]

The retainer agreement, entitled "Standard ADA Fee Agreement," governs the hundreds of ADA tester cases, and reads,

> The agreement shall set forth our understanding as to the nature and scope of the legal services we have agreed to render for you, the amount of our fees for these services, the manner in which our fees for these services shall be determined and the terms upon which you will make payment of these fees . . . . This agreement shall apply to all Title III ADA cases you ask me to handle for you.
>
> 1.  **Fees for Services**.  Although you will be billed for our services on the basis of an hourly rate, this provision is subject to item 4, referencing payment of fees and costs from only the defendant . . . . You understand that it is not possible at this time to determine the total amount of our fees for our services.
>
> 2.  **Costs**.  We will also charge you for certain costs and expenses, together with applicable taxes, if any, which may include investigative fees, expert witness

---

[7] Even though Gillespie promotes himself as a "disability rights" lawyer, he was unfamiliar with MARPC 19-301.14, which governs special obligations imposed on attorneys representing clients with disabilities.

and consultant fees, filing fees, recording costs . . . . The cost will also include fees for an expert ADA Consultant we will need to retain on your behalf. Such expert fees are currently running between $175.00 and $250.00 per hour. This provision is subject to item 4, governing the recovery of costs from only the defendant.

Yet the agreement also states that:

4. **<u>Payment of fees and Costs</u>**.  The fees and costs in this matter will be sought through an agreement to pay with the Defendant, or by the Defendant, pursuant to a Court Order.  We will seek payment of our fees and costs from the Defendant pursuant to the provisions of the Americans with Disabilities Act which provides that, "In an action pursuant to the Act, the Court may allow the prevailing party, reasonable attorneys' fees, including litigation expenses, and costs.

Standard ADA Fee Agreement Between Siam Sarwar and Thomas B. Bacon, Esq. (July 30, 2020) (on file with the Court) ("Fee Agreement").

Accordingly, the Fee Agreement plainly states that the client must pay for attorneys' fees and costs.  The Fee Agreement also informs the client that the attorneys will seek reimbursement from defendants in settlement.  But nowhere does the Fee Agreement discuss what happens if the case does not settle.  Thus, under its plain terms, the agreement binds the plaintiff to pay the expenses.  When pressed on this issue, Gillespie explained he had a side arrangement with the client that the Firm would never collect such fees and costs, and in fact, never does.

Adding to this confusion, the Fee Agreement also incorporates by reference a separate "Standard ADA Statement of Clients Rights," which the client also signs.  Even though Gillespie represents the clients in ADA cases *where money damages are not available,* the Statement refers in several places to a "contingency fee" arrangement and to how "money recovered in a case" will be disbursed.  Statement of Client's Rights Between Saim Sarwar and Thomas B. Bacon, Esq. (July 30, 2020) (on file with the Court) ¶ 1; *see also id.* ¶¶ 2 ("any contingency fee contract must be in writing") & 4 ("before signing any contingency fee Contract with you" and

16

"If lawyers from different law firms will represent you, at least one lawyer from each law firm must sign the contingency fee Contract.").

When pressed on the inscrutability of these documents, Gillespie responded that he has a "high level of confidence" that clients were not charged for services and that "in fact, our compensation structure is such that we only get paid based on the settlements, and we never turn to the plaintiffs themselves for those payments." Tr. at 84. Gillespie readily agreed that the retainer language is "100 percent confusing" and "terribly written" and "absolutely needs to be changed and revised." *Id.* at 82. While on the stand, Gillespie, after reviewing the agreement, admitted that it was "the first time I truly stared at it with such intent level of detail." *Id.* at 83. Indeed, Gillespie admitted that he never reviewed the agreements with his clients or otherwise did anything to ensure that they understood them. *Id.*

### B. Settlement Agreements

The Panel next moved to settlement agreements that Gillespie has secured in hundreds of cases. The terms of the settlement agreements—the same every time—set out the contractual obligations of each party. The agreement begins,

> **WHEREFORE**, in consideration of the promises and mutual covenants and undertakings contained herein and incorporated into this Settlement Agreement, *and other good and valuable consideration, the receipt and sufficiency of which is acknowledged*, the Parties agree to the following terms and conditions as a full and complete settlement of the Lawsuit.

*E.g.* ECF No. 6-17 at 3 (emphasis added). As for "good and valuable consideration," the agreement memorializes that the plaintiff will dismiss the suit with prejudice and release the defendant hotel from any liability arising under the ADA. In exchange, the defendant hotel agrees to pay a sum certain to cover "all attorney fees, costs and litigation expenses in full consideration of settlement in this case" that would otherwise be borne by the plaintiff. *Id.* at 3-

4.

But despite the plain language of this provision, the clients were never obligated to—or did—pay fees or costs. This fact was never disclosed to the defendant hotels. Thus, the settlement agreement conditioned the plaintiff's dropping the suit on the defendant hotel satisfying a phantom debt.

Making matters worse, Gillespie never reviewed the settlement agreements with his clients. On this issue, the Panel asked Gillespie,

> Q:   What did you do to make sure [Sarwar] understood the terms of the agreement?
> A:   I have *never gone through any settlement agreement with any plaintiff* and sat down with them and explained in detail the elements of any settlement agreement.
> Q:   So nothing? You did nothing?
> A:   *Nothing.*

Tr. at 85-86 (emphasis added). Gillespie simply would email the settlement agreement to Pezza, and Pezza would secure the client's signature. *Id.* at 87-88. Gillespie did not know whether Pezza did anything to explain the agreement to the clients, and Gillespie did nothing to confirm that the client even signed the agreement. *Id.* at 88.[8] Gillespie conceded that he "should have made a greater effort to the explain" the agreement's terms. *Id.* at 90.

The Panel next questioned Gillespie about the misrepresentations to the hotels in the agreements that the plaintiffs were carrying a debt to the attorneys when in fact they were not:

> Q:   There is a fee agreement with the client that says one thing. There is an understanding that, according to you, you have with the client, and I don't have any reason to doubt it, that the client knows they will never pay a dime to you. And then there is the representation to the defense counsel, which is completely the opposite, okay; that there is outstanding monies, and the signatory to that agreement, the plaintiff, is on the hook for the money. So that is lining up to me as a bait and switch, as, essentially a

---

[8] This testimony was in response to a question prompted by the Panel's review of a sample settlement agreement, incorporated into the Report, that purportedly was signed by Sarwar but where the signature block had "Deborah Laufer" in typeface as the signatory.

scheme; and when you multiply that by the hundreds of settlements, that becomes very concerning.  What is your response to that?

A:   I never thought that through like that . . . I don't know
. . . .

Q:   So you admit it's more than just sloppy recordkeeping and a failure to specify and break down and describe the work, accurately, thoroughly?

A:   Yes, I can easily see how this—this bait and switch thing you are describing, I see it.  I regret that I didn't think of it.

Tr. at 90-91.

In short, the hearing revealed that Gillespie had done nothing to ensure that his clients understood what they were signing when they retained Gillespie and the Firm.  Nor did he do anything to make sure they understood the terms of settlement agreements that extinguished their lawsuits.  Last, Gillespie misled the defendant hotels into paying the plaintiff's purported debt to the firm as "valuable consideration" for settlement, even though no such debt existed.

### C. Dismissal of Actions

The Panel next turned to the circumstances surrounding Gillespie's dismissal of over 100 ADA tester cases since becoming aware of this investigation.  *See id.* at 36 (Gillespie representing that "since my receipt of this expert investigation report, as has been mentioned, we've closed up shop and [the ADA litigation] hasn't continued.").  For the lion's share of these cases, dismissal was voluntary and not the product of a settlement.  Outcome Analytics by Party, *WestLaw Edge Litigation Analytics*, https://1.next.westlaw.com/analytics (navigate to "Litigation Analytics"; search Attorneys for "Tristan W. Gillespie"; then toggle to "Outcomes"; limit "Case type" to "Civil Rights—ADA"; and filter by date) (showing 127 uncontested dismissals since January 7, 2021).  Gillespie simply "dismissed" the matters, which were at all phases of the litigation—including some pending decisions on default judgment motions.[9]

---

[9] *E.g. Laufer v. AARK Hospitality Holding, LLC*, 1:20-cv-05648 (D.N.J. filed May 7, 2020); *Laufer v. 860 Vestal Empire, LLC, et al.*, No. 22-cv-00098 (N.D.N.Y. filed Feb. 2, 2022); *Sarwar v. Patel*, No. 21-cv-09036 (S.D.N.Y. filed Nov. 2, 2022).

At the hearing, Gillespie conceded that he had dismissed these actions without consulting

his clients.  Again, the colloquy merits full recitation:

> Q:  When you are dismissing all of these cases, what's the client involvement
>     in that?
> A:  None whatsoever.
> Q:  You just dismiss them?
> A:  That's right.
> Q:  You don't get their approval?
> A:  Correct.
> Q:  You don't see a problem with that?  It's their case.
> A:  You know, they kind of—they have entrusted us to work diligently on
>     their behalf.  And you know, in many ways, these cases do need to be
>     dismissed, just in terms of a million things; my time, judicial efficiency.  I
>     mean, the cases—you know, even in districts that are slightly unsettled,
>     you know we're just setting ourselves up for like lengthy appeals that, you
>     know, just have a dismal prospect at best.  You know, we don't have any
>     existing cases in the Eleventh Circuit, as an example, pending.
> Q:  But ultimately, under the ethical rules, it's their decision, right?  I mean,
>     there are some things that . . . ultimately, are their choice, whether to start
>     the lawsuit and whether to end the lawsuit.
> A:  Fair point.
> . . .
> Q:  Yeah, I don't remember exactly where I read it, but I thought that
>     somewhere . . . that the clients are told the clients are the owners of the
>     case, and so the clients, the plaintiff must decide [whether to dismiss the
>     action].  You, your decision, as the attorney, is the decision to withdraw.
>     That's right in your [ADA Fee Agreement].[10]  And what you're telling me
>     is that in these cases that you've dismissed, you have violated those two
>     prongs.  In other words, you haven't consulted with the plaintiff, and your
>     remedy is not to get out—to get the client out of the case but to withdraw.
>     That hasn't happened either.  Am I right about that?
> A:  That's correct.

Tr. at 92-94.

Gillespie offered no explanation for extinguishing his clients' lawsuits without first

---

[10] The full provision in the Fee Agreement reads:  "Undersigned clients understand that litigation is extremely expensive, time-consuming, dependent on expert witness testimony, and highly problematical with regard to the chances for success.  Clients further understand that these cases take many months to investigate, gather information and evaluate.  For these reasons, Clients recognize the right of said law firms to *withdraw from the case and return the file to Clients at said law firm's discretion.*"  Fee Agreement ¶ 5 (emphasis added).

seeking their permission or even their input.  To this day, it is unclear whether the clients were

informed that he had dismissed over 100 cases in advance of his disciplinary hearing.

### D.  Familial Relationship Between Firm Investigator and Plaintiff Laufer

Last, the Panel inquired about the relationship between Pezza and Plaintiff Laufer.  The

Panel was aware that Pezza is the former boyfriend of Laufer's daughter and the father of one of

Laufer's grandchildren.  *See* Transcript at 10-12, 15, 22, 26, 29-30, 36-38, *Laufer v. Fort Meade*

*Hospitality*, LLC, No. 20-cv-1974-SAG (D. Md. Feb. 1, 2021), ECF No. 27.  Initially, Gillespie

denied knowing of any "personal or familial relationship" between Pezza and any client.  Tr. at

44.  However, when pressed specifically about the Pezza-Laufer connection, he admitted he had

been "aware of that" for well over a year.  *Id.* at 79.

Because it is undisputed that ADA plaintiffs are *not* entitled to money damages, the Panel

asked whether Gillespie recognized the potential impropriety in paying Pezza, the father of

Laufer's grandchild, several hundred thousand dollars for his work in these matters.[11]  Gillespie

replied that while he had never viewed such payments as "under-the-table," he now recognizes

that he "probably should have been more on top of that."  *Id.* at 81.

### IV.  Gillespie's Violation of the Rules of Professional Conduct

This Court requires all barred attorneys to comply with the Maryland Attorneys' Rules of

Professional Conduct.  Loc. R. 704.  Based on this investigation, the Panel finds that Gillespie

has violated (1) the duty to keep clients reasonably informed about the scope of the fee

agreements and the direction of the litigation (MARPC 19-301.2 & 19-301.4); (2) the duty of

candor to the tribunal, both throughout his ADA tester litigation as well as this investigation

---

[11] A conservative estimate of the Laufer portfolio—600 cases—at a blended rate of $625 per case would
have generated $375,000 in income for Mr. Pezza.  *See* Tr. at 33.

(MARPC 19-303.3); and (3) the duty of fairness and candor to opposing counsel, with respect to representations made during settlement negotiations (MARPC 19-303.4 and 19-304.1).

The Panel discusses each breach in turn.

### A.  Duty to Keep Client Reasonably Informed (MARPC 19-301.2 & 19-301.4)

In the attorney-client relationship, the client retains the "ultimate authority to determine the purposes" served by the legal representation within the bounds of the law.  *See* Md. Att'y R. Prof. Conduct 19-301.2 cmt. 1.  MARPC 19-301.2, therefore, requires that "an attorney shall abide by a client's decisions concerning the objectives of representation."  This includes whether to conclude the litigation by settlement or dismissal.  *Att'y Grievance Comm'n v. Mitchell*, 445 Md. 241, 253 (2015) (finding that dismissal contrary to client's directions violated MARPC 1.2 and summarizing similar cases involving the rule).

A companion duty under MARPC 19-301.4 requires attorneys keep the client informed "to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."  An attorney who does not update a client about the status of her case deprives the client of the ability to choose how the case will proceed.  *See Att'y Grievance Comm'n v. Proctor*, 479 Md. 650, 680-83 (2022); *see also Att'y Grievance Comm'n v. Hamilton*, 444 Md. 163, 181-85 (2015).

Gillespie has violated these rules for the duration of his representation of Laufer and Sarwar in hundreds of ADA tester cases.  Gillespie admitted that the attorney-client relationship is governed by a near-inscrutable fee agreement that he never reviewed with his clients or even read closely himself.  Nor did Gillespie ever explain to the client the meaning of the reference in the "Statement of Rights" to contingency fees—which by law cannot apply to ADA cases because the ADA does not permit monetary damages.  Tr. at 82-84.

Adding insult to injury, Gillespie took cover by asserting that the Firm has never collected fees from their ADA clients. *Compare* Fee Agreement ¶¶ 2-4, *with* Tr. at 83-84 ("[T]he plaintiffs, our clients, have never been charged for our services."). This does little to mitigate the harm caused to the clients who have signed agreements that are facially incoherent and inconsistent with the stated billing practices. *Att'y Grievance Comm'n v. Ucheomumu*, 450 Md. 675, 704 (2016) (finding that attorney communicated fee structure to client that was inconsistent with retainer agreement and "that Respondent's failure to clearly communicate his billing structure . . . in an unambiguous manner is a violation of [MARPC 19-30]1.4(b)").

Next, Gillespie did not communicate *at all* with his clients during the settlement process. He admits to having "*never* gone through any settlement agreement with any plaintiff." Tr. at 85 (emphasis added). Instead, Gillespie abdicated that duty to his putative investigator, who procured the client's signature. Thus, Gillespie made no effort to ensure that the clients understood the terms of the settlement agreements that extinguished their right to pursue the litigation. *Cf. Att'y Grievance Comm'n v. Smith*, 443 Md. 351, 371 (2015). He also did not disclose to his clients that the agreement essentially perpetrates a fraud on the defendant hotels by leading them to believe the clients are responsible for the attorney fees and expenses even though they are not. *See infra* Section III.B.

Gillespie also never discussed with either Laufer or Sarwar the decision to dump their cases en masse after this Panel scheduled the disciplinary hearing. *Cf. Att'y Grievance Comm'n v. Pennington*, 387 Md. 565, 572, 592-93 (2005) (finding that attorney who had dismissed case without first notifying her clients had violated MARPC 19-301.4); *see also Att'y Grievance Comm'n v. Shapiro*, 441 Md. 367, 385 (2015); *Sperling*, 432 Md. at 494; *Att'y Grievance Comm'n v. De La Paz*, 418 Md. 534, 554 (2011). It is axiomatic that an attorney files an action

on behalf of a client.  The client, therefore, must remain reasonably informed to decide whether

his or her suit should continue.  Yet Gillespie removed his clients entirely out of that decision-

making process.

Further, the timing of Gillespie's wholesale series of case dismissals is not lost on this

Panel.  Indeed, the same matters that Gillespie touts as a deeply rewarding public service are the

ones he unloaded without client consent in an apparent attempt to convince the Panel that we

need not worry about his appearances in this Court going forward.  Tr. at 29.  This transparent

elevation of his own self-interest over his clients makes these violations especially troubling.

### B.  Duty of Candor to Tribunal (MARPC 19-303.3)

As "officers of the court," attorneys maintain a fundamental duty of candor to the

tribunal.  This principle is codified in MARPC 19-303.3, which prohibits lawyers from

knowingly making a false statement of fact or law to a tribunal or failing to correct a previous

false statement.  Attorneys must always "be fully honest and forthright" with courts.  *Att'y

Grievance Comm'n v. Dore*, 433 Md. 685, 703 (2013) (quoting *In re Discipline of Wilka*, 2001

S.D. 148 (2001)).  Gillespie's violation of this rule is repeated and blatant.

In scores of fee petitions filed across the country, Gillespie has misrepresented the time

spent on each matter.  *Cf. Att'y Grievance Comm'n v. Berry*, 437 Md. 152, 187 (2014) (finding a

MARPC violation where attorney included false statements in fee petitions); *Att'y Grievance

Comm'n v. Steinberg*, 395 Md. 337, 369 (2006) (finding that false statements in motion for

reconsideration violated MARPC 19-303.3).[12]  For example, Gillespie almost always sought

---

[12] Gillespie has not submitted fee petitions in this District, Tr. at 51, but he has submitted fee petitions in other district courts, *see, e.g.*, *Kennedy v. SATYA GROUP, LLC*, No. 2:17-cv-14393-RLR (S.D. Fla. Jan. 3, 2018). Gillespie does so under the penalty of perjury.  *See* ECF No. 6-10 at 30 (affidavit attached to fee petition swearing "my time records are accurate").  The Committee may consider Gillespie's conduct outside of this jurisdiction as relevant to this disciplinary proceeding.  *See* D. Md. Loc. R. 703 ("Any attorney practicing before this Court or who has practiced before this Court in any way shall be deemed thereby to have conferred disciplinary jurisdiction upon the Court for any alleged misconduct of that attorney.").

reimbursement for 2.5 to 4 hours of attorney time to draft and file the summons and complaint. *See generally* ECF No. 6-13.  The Investigator rightly noted the number to be "implausibly high" when considering that Gillespie filed multiple complaints in any given day while holding down a full-time job as a prosecutor in Georgia.  ECF No. 6 at 19-20.  Further, given that each complaint is near identical in words and form, it blinks at reality that Gillespie would have spent several hours drafting *each* complaint every time.  At the hearing, Gillespie conceded as much.  Tr. at 55.

Gillespie also has misrepresented his employment when petitioning for attorneys' fees. Often in attorney fee motions, Gillespie asks for a higher billable rate because litigating Title III ADA cases supposedly generates "negative publicity" and therefore precludes Gillespie from attracting other work.  *See, e.g.*, ECF No. 6-10 at 15-16.  But Gillespie did not tell those same courts that he was already working as an Assistant District Attorney.  *See* ECF No. 6-4.  Clearly, the ADA cases did not preclude him from taking other work—his full-time job as a prosecutor did.  *Cf. Att'y Grievance Comm'n v. Sloane*, AG No. 37, Sept. Term, 2021, 2023 WL 2320297, at *159-60 (Md. Mar. 2, 2023) (finding that material omissions violate MARPC 19-303.3).

At the hearing, Gillespie suggested that he omitted this information because it was not relevant to his ADA work,  Tr. at 66, or that perhaps he made a "clerical error" in attaching the "wrong resume" to fee petitions.  *Id.* at 68.  The Panel finds neither explanation satisfactory.  If credited, the omission speaks to his sloppiness and inattention to the veracity of representations made to federal courts across the country.  At worst, it is another misrepresentation in a long series of misrepresentations that have plagued Gillespie's involvement in this ADA tester litigation.

The Panel also agrees with the Investigator that Gillespie exhibited a lack of candor to the

Court in the *Patel* matter.  Gillespie knew that Pezza was Sarwar's paid investigator.  Yet he allowed Sarwar to testify in a way that clearly misled the court, so much so that the final opinion referred to Pezza as Sarwar's "friend" and travel companion.  Gillespie should have corrected the record, but he did not.  Even worse, when confronted about this failure, Gillespie blamed the erroneous testimony on Sarwar's cognitive limitations.

Last, Gillespie's lack of candor during this Investigation constitutes separate grounds for sanction.  *See Att'y Grievance Comm'n v. Butler*, 456 Md. 227, 238-39 (2017).  As to his inflated fee petitions submitted to courts around the country, Gillespie's shifting explanations defy credulity.  Initially, Gillespie insisted to the Investigator that the fee petitions were accurate. ECF No. 6 at 21.  He doubled down on that theory in his opening statement to the Panel, where he expressed regret for not explaining why it took well over two hours to draft a largely boilerplate complaint.  Tr. at 31.  Yet when pressed during questioning, Gillespie readily conceded that the numbers were not accurate.  *Id.* at 55 (Question: "To draft the complaints, do you stand by that number two and a half hours?"  Answer: "No.").

Indeed, even at the hearing itself, the truth for Gillespie was elusive.  Concerned about the propriety of payments made to Pezza, the Panel asked Gillespie a basic question about whether he was aware of a personal relationship between Laufer and the firm investigator. Gillespie initially claimed to be wholly unaware of any such relationship.  *Id.* at 44-45.  Yet later in his testimony, Gillespie admitted to knowing that Pezza was the father of Laufer's grandchild. *Id.* at 79.  Even more disturbing is the ease with which Gillespie provided two flatly inconsistent answers under oath, at a hearing about whether his lack of candor to the tribunal merited formal discipline.  For these reasons, the Panel concludes that Gillespie's lack of candor to this tribunal is its own violation of MARPC 19-303.3.

### C. Duty of Fairness and Candor to Opposing Counsel (MARPC 19-303.4 & 19-304.1)

MARPC 19-303.4 and 19-304.1 impose on attorneys the duties of fairness and candor when interacting with opposing counsel and other third parties.  An attorney's false statements or material omissions during settlement negotiations violates this duty.  *See Ausherman*, 212 F. Supp. 2d at 443-44 ("It is just as damaging to the integrity of our adversary system for an attorney knowingly to make a false statement of material fact to an opposing counsel during settlement negotiations, as it is to lie to a lawyer or the judge in court."); *see also Att'y Grievance Comm'n v. Daley*, 476 Md. 283, 299-300 (2021).

The Panel finds that Gillespie has persistently violated these rules in several ways.  As already discussed, Gillespie misled defense counsel to believe that plaintiffs had actually incurred attorneys' fees and costs that they had not.  The amount negotiated as "good and valuable consideration" to the plaintiff for dropping her suit was *never* to be borne by the plaintiff, yet the settlement agreements plainly state the opposite.

Gillespie's attorney-fee demands also bore no correlation to time actually spent on the case.  As to past work, Gillespie's timesheets are unreliable and routinely inflated.  While he may not have provided these timesheets to opposing counsel, they nonetheless illustrate Gillespie's tendency to exaggerate his actual work to extract a favorable fee.  *See, e.g.*, ECF No. 6-14 at 2 (showing 3.9 hours for research, drafting, and filing on August 11, 2020, the date Gillespie filed at least fifteen other complaints).

Further, of the three settlement options that Gillespie provided to opposing counsel, two accounted for an outsized attorney-fee reimbursement that contemplated his future work.  *See* ECF No. 6 at 18; *see also* ECF Nos. 6-8 & 6-12.  Gillespie admitted that in the hundreds of cases for which he has been counsel of record, he has *never* performed such future work.  Tr. at 46.

This fictional future time conveniently aids the misimpression that Gillespie has worked harder on these cases than he has or will.  Gillespie's lack of candor during settlement negotiations violates MARPC 19-303.4 and 19-304.1.

### D.   Relationship of Laufer and Pezza

Finally, the Panel would be remiss if it did not address the improper alliance between Gillespie's investigator Pezza and client Laufer.  Pezza evidently has been paid several hundred thousand dollars as the putative "ADA Expert," who does little-to-nothing for the case.  Pezza is also the father of Laufer's granddaughter, who appears to be Laufer's travel companion in the tester litigation.  Transcript 10-12, 15, 22, 26, 29-30, 36-38, *Laufer v. Fort Meade Hospitality*, *LLC*, No. 20-cv-1974-SAG (D. Md. Feb. 1, 2021), ECF No. 27.  When confronted about this, Gillespie recognized the apparent "conflict" of paying Laufer's kin when she cannot be paid herself.  Because this arrangement "smacks 'of purchasing an interest in the subject matter of the litigation' in which the lawyer is involved," it is highly problematic.  *Att'y Grievance Comm'n v. Eisenstein*, 333 Md. 464, 486 (1994) (quoting 2 *ABA/BNA Lawyers' Manual on Professional Conduct*, 51:803 (1991)).  Ultimately, however, this information came to the Panel too late in the investigation to draw any firm conclusions.  Thus, while the Panel seriously questions whether any such payments to Pezza were for legitimate services rendered, it leaves unanswered whether Laufer improperly received any such funds as compensation for her part in the tester litigation.

### V.   Recommended Sanction

The chief purpose of attorney discipline is "protection of the public, not the punishment of the erring attorney."  *Att'y Grievance Comm'n v. Colton-Bell*, 434 Md. 553, 572 (2013); *see In re Liotti*, 667 F.3d 419, 430-31 (4th Cir. 2011).  Sanctions also provide general and specific deterrence aimed at sustaining public confidence in the legal profession.  *Att'y Grievance*

*Comm'n v. Thomas*, 440 Md. 523, 556 (2014).  The sanction should be the least extreme possible

that will nevertheless achieve the purposes for which it is imposed.  *See Byrd v. Hopson*, 108 F.

App'x 749, 756-57 (4th Cir. 2004).

For aggravating circumstances, the Panel looks to the suggested factors of the American

Bar Association.  *Att'y Grievance Comm'n v. Coppock*, 432 Md. 629, 648 (2013); *Att'y*

*Grievance Comm'n v. Bleecker*, 414 Md. 147, 176-77 (2010).  The factors include:

> (a) Prior disciplinary offenses;
> (b) Dishonest or selfish motive;
> (c) A pattern of misconduct;
> (d) Multiple offenses;
> (e) Bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
> (f) Submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
> (g) Refusal to acknowledge the wrongful nature of conduct;
> (h) Vulnerability of victim;
> (i) Substantial experience in the practice of law;
> (j) Indifference to making restitution; [and]
> (k) Illegal conduct, including that involving the use of controlled substances.

*Coppock*, 432 Md. at 648 n.17 (citing Am. Bar Assoc., *Standards for Imposing Lawyer*

*Sanctions*, § 9.22, Compendium of Professional Responsibility Rules and Standards (2012)).

Among the pertinent aggravating factors, most salient here is the sheer volume of cases in

which Gillespie disregarded the welfare of his clients.  Gillespie violated the rules not once or

twice, but hundreds of times.  In each case, he never explained the fee agreements or reviewed

the settlement agreements with his clients.  When he was in hot water with this Court, he

reflexively dismissed over 100 active cases without ever consulting his clients.  On the whole,

Gillespie litigated his cases with his clients as an afterthought.  They were largely irrelevant to

the process.

Next is the vulnerability of Gillespie's clients, especially Saim Sarwar.  Sarwar suffers

from cerebral palsy, which, by Gillespie's own admission, affects Sarwar's cognition.  Yet where Gillespie should exercise special care in representing disabled clients such as Sarwar, he has exercised none.

Third, Gillespie's pattern of dishonesty is patent.  His cavalier approach to the truth before scores of tribunals warrants a serious response to uphold the integrity of our judicial system.  In default judgment motions filed across the country, Gillespie proffered hundreds of hours he did not work, or had no intention of working, to obtain an order for fees that he did not earn.  With the same disregard for the truth, Gillespie has extracted countless settlement agreements to be paid attorney fees for similarly fictionalized representations of work performed or to be performed when, according to Gillespie, he never collected or intended to collect from the plaintiffs in the event the matter did not settle.

Fourth, Gillespie persisted in his misrepresentations to this Panel, failing to fully acknowledge the seriousness of his transgressions.  To be sure, Gillespie responded to document requests and sat for an interview.  But he also persistently denied any wrongdoing, insisted on the accuracy of his fee petitions, doubled down on the nobility of his work, and feigned ignorance about breaching some of the most fundamental duties that a lawyer owes to his clients.

Turning to mitigating factors, they are mixed.  Gillespie is an experienced litigator who should and did know better.  But he has practiced law for nearly twenty years without any prior discipline.  Gillespie further claims to have "closed up shop" as to the ADA tester cases, suggesting the risk of future ethical breaches is low.  But he ended his ADA tester case pursuits because the Court raised concerns about his misconduct, not because he was concerned for his ADA clients.

Perhaps the single greatest mitigating factor is that Gillespie appears to have acted largely

at the direction of his boss, Thomas B. Bacon, and that he has since cut ties with Bacon.  In this Panel's view, Gillespie joined a pre-existing scheme that raises serious ethical concerns— including repeat clients, a compromised investigator, and a method for extracting unwarranted attorneys' fees from targeted hotels based on a well-worn settlement script.[13]  Gillespie was not the driving force behind this operation, and he appears to have extricated himself from Bacon's firm.  The proposed sanction, thus, must be serious enough to provide needed encouragement for Gillespie to not rekindle the partnership with Bacon in the future.

In the end, Gillespie's conduct unquestionably merits stiff sanction.  The Panel recommends that Gillespie be suspended from the Bar of this Court for a period of six months. Thereafter, Gillespie may petition the Court for reinstatement pursuant to Local Rule 705.4.  The recommended sanction serves the twin purposes of protecting future clients and the integrity of the courts.  It also takes into consideration that Gillespie's transgressions appear directly tied to his partnership with Bacon, which he has since severed.

We thank the Committee for the opportunity to serve on this important matter.

Dated:  6/30/2023

/S/
_____
Paula Xinis
United States District Judge

/S/
_____
Deborah L. Boardman
United States District Judge

/S/
_____
Ajmel A. Quereshi
United States Magistrate Judge

---

[13] According to the Report, Bacon has faced disciplinary proceedings in the United States District Court for the Middle District of Florida.  ECF No. 6 at 5-6 (citing *In re: ADA Cases*, No. 6:18-mc-14-Orl-31DCI (M.D. Fla. docketed Feb. 20, 2018)).  The Florida disciplinary matter resulted in a formal admonishment and 12 months of monitoring for Bacon.  *Id.*